UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| ROBERT G. FOWLER, | ) | CIV. 08-5043-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER ON CROSS |
| vs. | ) | MOTIONS FOR SUMMARY |
| | ) | JUDGMENT |
| LAC MINERALS (USA), LLC, a | ) | |
| Delaware limited liability | ) | |
| company, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on cross motions for summary
judgment (Dockets 20 and 24) filed by the plaintiff, Robert G. Fowler,
("Fowler"), and the counterclaim defendant, LAC Mineral (USA), LLC ("LAC").
Plaintiff's amended complaint (Docket 16) contains claims for declaratory
judgment, specific performance and quiet title and the defendant's
counterclaim (Docket 17) asserts nonspecific claims for declaratory judgment
and quiet title–all relating to the same ninety mining claims and documents
relating to that real estate.  Plaintiff's motion for summary judgment (Docket
20) seeks judgment in his favor on all three of his claims.  Defendant's motion
for summary judgment (Docket 24) seeks a quiet title judgment in favor of LAC
in this same real estate.

**STANDARD OF REVIEW**

Under Fed. R. Civ. P. 56(c), a movant is entitled to summary judgment if
the movant can "show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing that a genuine issue of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Id. at 248. Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. (emphasis in original).

If a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate. Id. However, the moving party is entitled to judgment as a matter of law if the nonmoving party has failed to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In such a case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the

nonmoving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986).  The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  <u>Anderson</u>, 477 U.S. at 251-52.

## UNDISPUTED MATERIAL FACTS

LAC's initial predecessor, St. Joe American Corporation ("St. Joe American"), and Viable Resources Inc. ("Viable") entered into an Option and Joint Venture Agreement ("1984 JVA") on January 25, 1984.  (Docket 26 at #1).  Under the 1984 JVA, St. Joe American purchased the right to evaluate the mineral potential of properties, including ninety mining claims and numerous unpatented mining claims, owned or controlled by Viable in Lawrence County, South Dakota.  (Docket 26 at #2).  The properties were often referred to by Viable as the "Carbonate Properties."  <u>Id.</u>

By the 1984 JVA, St. Joe American also entered into a joint venture with Viable for the development of mineral resources within the Richmond Hill Mine properties.  (Docket 26 at #3).  The Richmond Hill Mine and the Carbonate Properties are located approximately five miles northwest of Lead, South Dakota.  (Docket 26 at #4).  St. Joe American began exploring for gold and silver at the Richmond Hill Mine in the spring of 1984.  (Docket 26 at #5).

A First Amendment to the 1984 JVA dated January 1, 1985, ("First Amendment") defined the boundaries of the Richmond Hill Prospect and a Spanish R. Prospect at the Richmond Hill Mine.  (Docket 26 at #6).  No other

prospects were ever defined or delineated and no production work plan under Section 5.1 of the First Amendment was ever developed for the Spanish R. Prospect. Id. By May 10, 1985, St. Joe American had invested in excess of $1,000,000 of its funds in the exploration of the Carbonate Properties. (Docket 26 at #8). By May 10, 1985, St. Joe American had also paid Viable a total of $375,000 under the 1984 JVA. (Docket 26 at #10). Those payments by St. Joe American were as follows: $75,000 on January 25, 1984; $150,000 by July 25, 1984; and $150,000 by January 25, 1985. Id.

On May 10, 1985, St. Joe American and Viable entered into a Second Amendment to the 1984 JVA ("Second Amendment"). (Docket 26 at #7). The Second Amendment accelerated payments to Viable under the 1984 JVA to provide funds for Viable's Plan of Reorganization in Bankruptcy Court in the District of Wyoming. (Docket 26 at #9). Under the Second Amendment, St. Joe American agreed to pay Viable a total of $500,000, and Viable agreed to convey to St. Joe American all of Viable's "right, title and interest" in all the Carbonate Properties initially defined in the 1984 JVA. (Docket 26 at #11).

By a Mining Deed dated July 18, 1985, Viable conveyed eighty-nine mining claims of the Carbonate Properties to St. Joe American. (Docket 26 at #12). This mining deed was recorded as Doc. No. 85-2424 in the office of the Lawrence County Register of Deeds, Deadwood, South Dakota. (Docket 17-4).

By a Mining Deed dated December 23, 1985, St. Joe American conveyed the eighty-nine mining claims to St. Joe Gold Corporation

("St. Joe Gold").  (Docket 26 at #14).  On February 24, 1987, Viable conveyed the ninetieth claim, the Mars No. 1 patented mining claim of M.S. 1851, to St. Joe Gold.  (Docket 26 at #15).  This mining deed was recorded as Doc. No. 87-1214 in the office of the Lawrence County Register of Deeds, Deadwood, South Dakota.  (Docket 17-5).

Both the First Amendment and Exhibit D of the 1984 JVA define the Richmond Hill Prospect.  (Docket 26 at #16).  By various conveyances St. Joe Gold transferred all ninety claims to St. Joe Richmond Hill.  (Docket 26 at #17 and #18).  The ninety  claims are part of LAC's Richmond Hill Mine properties. (Docket 26 at #19).

In February 1988, the South Dakota Board of Minerals and Environment ("SDBME") granted Large-Scale Mine Permit No. 445 for the Richmond Hill Mine for mining and processing of precious metals.  (Docket 26 at #20). SDBME granted Large-Scale Mine Permit No. 460 ("Permit No. 460") for a portion of the Richmond Hill Mine in February 1995 for mining of limestone and clay for use as reclamation materials on the mine site.  (Docket 26 at #21). Permit No. 460 is still active.  Id.  The post-mining land use approved by SDBME for all Richmond Hill Mine permit areas is as wildlife habitat.  (Docket 26 at #22).

By corporate name changes and mergers, St. Joe Richmond Hill became Bond Gold Richmond Hill, Inc. ("Bond Gold"), which became Richmond Hill Inc. ("Richmond Hill"), which became LAC Minerals (USA) Inc. ("LAC Minerals"), which became LAC Minerals (USA) LLC ("LAC").  (Docket 26 at #23).

On December 2, 1988, Bond Gold and Viable entered into a Purchase Agreement ("1988 PA"). (Docket 26 at #24). One of the reasons for the 1988 PA was to provide for the sale by Viable to Bond Gold of one-half of Viable's Participation Payment in the Richmond Hill Prospect for the sum of $425,000. Id. Viable conveyed one-half of its Participation Payment in the Richmond Hill Prospect to Bond Gold by a General Warranty Deed dated December 2, 1988. (Docket 26 at #25). The 1988 PA was also entered to restate the 1984 JVA, the First Amendment and the Second Amendment. (Docket 26 at #24). On that same day, December 2, 1988, Bond Gold and Viable executed a Restated Joint Venture Agreement ("1988 RJVA").[1] (Docket 26 at #26).

In an Option to Purchase dated November 15, 1995, Viable granted Donn C. Douglass the option to purchase Viable's "Residual and Reassignable Interest" in the Carbonate Properties (including the ninety patented mining claims Viable had previously conveyed to LAC's predecessors) (the "Douglass Option"). (Docket 26 at #28). The Douglass Option stated "Viable's Residual and Reassignable Intrerest (sic) in the properties is reiterated and reaffirmed in Section 4.3 of the [1988 RJVA]." Id. The Douglass Option set the purchase price for the "Residual and Reassignable Interest" at $15,000, and stated the purchase price "represensts (sic) a fair payment for a right which may, or may

---

[1]By a Letter Agreement signed by Bond Gold on November 13, 1990, and by Viable on November 20, 1990, the Atwood patented lode mining claim of M.S. 977 was added to and included in the Richmond Hill Prospect. (Docket 26 at #27).

not develop, and which payment may be in risk of total loss if no properties are reassigned to Viable." Id.

The Douglass Option was recorded in the Office of the Lawrence County Register of Deeds on January 21, 1997, as Doc. No. 97-244. (Docket 26 at #29). By quitclaim deed dated October 15, 1997, Viable quitclaimed the Carbonate Properties to Donn C. Douglass. (Docket 26 at #30). Douglass transferred the Carbonate Properties to Fowler by a quitclaim deed dated November 14, 1999. (Docket 26 at #31). The property in dispute consists of the ninety mining claims comprising approximately 944 acres. (Docket 36 at #2).

On October 11, 2001, Fowler formally requested the annual "release" of "mineral interests that are not being used for mining purposes." (Docket 36 at #25) (quotations in original). On December 24, 2001, LAC responded asserting the agreement was misread, there was "no requirement that LAC release or reassign any mineral interest and gives Viable no right to demand such an assignment, whatever Viable's 'rights may be . . .' and further asserting '[i]n the past LAC has negotiated in good faith to acquire Viable's rights under the Agreement.' " Id. On July 22, 2003, Barrick Gold's land manager, Margie Boorda, who handled all of the discussions on behalf of LAC regarding the return of the properties, wrote "we are making great strides in determining which fee properties may be released." Id.

Todd A. Duex began working as an exploration geologist at the Richmond Hill Mine in November 1984. (Docket 26 at #32). His

responsibilities to the present time have included the positions of Exploration Manager, Project Manager for Permitting and Development, Chief Geologist, Environmental Superintendent, and Site Manager.  Id.  During Mr. Duex's tenure at the Richmond Hill Mine, the land purchased from Viable has always been assessed to LAC and its predecessors, and LAC and its predecessors have always paid all the real estate taxes on the property.  (Docket 26 at #33).

St. Joe American and its successors were the Richmond Hill Mine managers under the 1984 JVA, the First Amendment, the Second Amendment, and the 1988 RJVA.  (Docket 26 at #36).  LAC has been the manager since December 31,1993.  (Docket 26 at #37).

All mineral exploration and mining for precious metals at the Richmond Hill Mine ceased in 1993.  (Docket 26 at #38 and #39).  By at least 1996, Viable was aware final reclamation of the heap leach pads was underway, which conclusively demonstrated all exploration and mining had ceased.  (Docket 26 at #39).

LAC admits reclamation is continuing.  (Docket 17 at #16).  The map of the Richmond Hill Mine (Docket 30), attached as Exhibit R to the Duex Affidavit, shows the locations of the following:

a. Mine permit boundary.
b. Water collection and storage ponds.
c. Water treatment facilities.
d. Ground water and surface water monitoring sites.
e. Acid rock drainage ("ARD") areas that have been capped, sealed, and/or reclaimed.
f. Capped, sealed and reclaimed heap leach pads.
g. Limestone, rock, and clay resources.
h. Sludge disposal pond.

| | |
|---|---|
| i. | Other areas affected by recent mining operations. |
| j. | Historic mine workings. |
| k. | Adjacent property owned by Scott L. Prentice and Jeanne L. Prentice. |
| l. | Private roads. |
| m. | The ninety patented mining claims purchased from Viable. |
| n. | The Richmond Hill Prospect area. |
| o. | Aquatic monitoring sites. |
| p. | Lands recently purchased or leased from other parties. |

(Docket 26 at #34). The surfaces of the capped, sealed and reclaimed acid rock drainage ("ARD") areas and heap leach pads cannot be disturbed. (Docket 26 at #35). Any surface disturbances of the capped and sealed areas would penetrate the clay and/or geosynthetic seals, allowing water and air to enter. Id. Water and air would increase ARD, cause problems with water quality and impact aquatic resources. Id. Disturbance of other reclaimed areas could contribute to the release of poor quality water. Id.

The following operations are still being conducted on the lands acquired from Viable (the ninety patented mining claims):

| | |
|---|---|
| a. | Ground water and surface water monitoring. |
| b. | Reclamation. |
| c. | Aquatic monitoring. |
| d. | ARD mitigation and containment. |
| e. | Water collection and storage. |
| f. | Performance monitoring on the capped, sealed and reclaimed ARD areas and leach pads. |
| g. | Site security and maintenance, including storm water control. |
| h. | Water treatment. |

(Docket 26 at #41). Lawrence County requires a minimum buffer zone of five hundred feet between lands disturbed by mining and adjoining landowners. (Docket 26 at #42).

LAC's experiences since 1999 with adjoining landowners Scott L. Prentice and Jeanne L. Prentice ("Prentices") resulted in a number of operational problems for LAC. (Docket 26 at #43). Gates were left open and there were operational problems with the gates, and unknown persons entered the mine site, bypassing internal gates to access clearly restricted and sensitive areas, such as the ARD areas and the reclaimed heap leach pads. Id. There are maintenance demands for the private roads on the mine site. Id. The haul road and all access roads on the mine site are to be discontinued and reclaimed and this will essentially eliminate Prentices' access to their residence. Id. The South Dakota Department of Natural Resources decided that a reduced-width road may be left in place for use by Prentices, if LAC agrees to maintain the road and manage storm water runoff from the road forever. Id.

LAC, as the manager, has never determined that any portions of the fee lands (the ninety mining claims) purchased from Viable have little potential for containing minerals of economic value or that any portions of the lands are not required for mineral development or mining facilities. (Docket 26 at #40).

**ISSUES FOR SUMMARY JUDGMENT**

The legal questions before the court by these cross motions for summary judgment are:

1.    What are the intent and legal ramifications of the 1984 JVA, the First Amendment, Second Amendment, the 1988 RJVA and the various deeds executed in relationship to these agreements?

2.    What rights, if any, does Viable retain as the result of these transactions?

3.    Does Viable only have a Participation Payment interest, with no reversionary rights to the property, or is Viable's interest a transferrable expectation of a future ownership interest?

4.    If Viable has a retained interest, is it a personal contract right or an assignable property right?

5.    If Viable holds an assignable property right, is the assignment to Douglass and then Fowler in violation of the terms of the 1988 RJVA, thus rendering the assignment void?

6.    If the Viable interest is assignable to Fowler, what is the South Dakota statute of limitations which applies to enforcement of the interest?

7.    Has LAC acted in good faith under the 1988 RJVA in its decision relating to the release of property from that agreement?

8.    Is LAC obligated at this time under the 1988 RJVA to release property to Fowler?

**DECISION**

**ISSUE #1:** <u>What are the intent and legal ramifications of the 1984 JVA, the First Amendment, Second Amendment, the 1988 RJVA and the various deeds executed in relationship to these agreements</u>?

The court, in this diversity action, adheres to the principles of South Dakota law when construing a contract. <u>Hiatt v. Mazda Motor Corporation</u>, 75 F.3d 1252, 1255 (8th Cir. 1996) ("It is . . . well-settled that in a suit based on diversity . . . jurisdiction the federal courts apply . . . the substantive law of the relevant state.") (citing <u>Erie R.R. Co. v. Thompkins</u>, 304 U.S. 64, 78 (1938)).

> When construing a contract, the court must ascertain and give effect to the intention of the parties. <u>Malcolm v. Malcolm</u>, 365 N.W.2d 863 (SD 1985). That intention is found in the contract language. <u>Id.</u> Unless the language is ambiguous or a different intention is manifested, the language in a contract is to be given its plain and ordinary meaning. <u>See</u> <u>Restatement (Second) of Contracts</u> § 202(3) (1981). Whether contract language is ambiguous is a question of law. <u>Enchanted World Doll Museum v. Buskohl</u>, 398 N.W.2d 149 (SD 1986). Language is ambiguous when a genuine uncertainty exists as to which of two or more meanings is correct. <u>North River Ins. Co. v. Golden Rule Constr., Inc.</u>, 296 N.W.2d 910 (S.D.1980).

<u>Hot Stuff Foods, LLC v. Mean Gene's Enterprises, Inc.</u>, 468 F. Supp. 2d 1078, 1101 (D.S.D. 2006) (other internal citation omitted).

"The interpretation of a contract is a question of law." <u>Pauley v. Simonson</u>, 2006 SD 73, ¶ 8, 720 N.W.2d 665, 667 (internal citations omitted). The court must look "to the language that the parties used in the contract to determine their intention." <u>Id.</u> at 2006 SD at ¶ 8, 720 N.W.2d at 667-68 (internal citations omitted). "If that intention is clearly manifested by the

12

language of the [agreement], it is the duty of this court to declare and enforce it." Id. (internal citations omitted).

Under the 1984 JVA on July 18, 1985, Viable delivered to St. Joe American a document captioned "Mining Deed." (Docket 28-9). That deed was filed with the Lawrence County Register of Deeds on August 16, 1985, as Document #85-2424. Id. The mining deed declares its purpose is to "grant, bargain, sell and convey" to St. Joe American mining claims in Lawrence County, South Dakota (eighty-nine of the ninety mining claims which are the subject of this current litigation). Id. That conveyance contains the following reservation of rights with Viable:

> SUBJECT TO:
> . . . .
> 4. Those rights to obtain a reconveyance in the property or otherwise participate in the development and mining of the same as specified in that certain Second Amendment to Option and Joint Venture Agreement dated effective May 10, 1985, a memorandum of which is of record in the official records of Lawrence County as document _____.

Id. The memorandum referenced in the mining deed was not filed with the Lawrence County Register of Deeds, but there is no question but that the reconveyance reference is to the Second Amendment of the 1984 JVA.[2] This reconveyance right is integrated into the 1988 RJVA.

---

[2]Viable executed a separate Mining Deed to St. Joe Gold Corporation for the ninetieth mining claim and that deed contains a reservation in Viable under the Second Amendment to the 1984 JVA. All further discussion addresses the combined ninety patented mining claims

By the clear language of the 1988 RJVA, it supersedes the provisions of the 1984 JVA, the First Amendment and the Second Amendment:

> 1.2 Viable and the predecessors in interest of Bond entered into an Option and Joint Venture Agreement dated January 25, 1984, which agreement was amended by the First Amendment to Option and Joint Venture Agreement dated January 1, 1985, and the Second Amendment to Option and Joint Venture Agreement dated May 10, 1985 (collectively, the "First Agreement").

> 1.3 Viable and Bond desire to restate the First Agreement, and to participate in the joint exploration, evaluation, development and mining of mineral resources within the Properties, on the terms and conditions set forth herein.

(Docket 28-16).[3]  Under Section 3.2, <u>Viable's Representations</u>, Viable acknowledges the 1988 RJVA is a "valid, enforceable and binding obligation of Viable in accordance with [the] terms . . . ." <u>Id.</u>  It was clearly the intent of the 1988 RJVA to supersede and supplant the 1984 JVA.  These provisions are unambiguous and enforceable.  <u>Pauley</u>, 2006 SD at ¶ 8, 720 N.W.2d at 667-68.  Therefore any changes from the language of those earlier documents, when compared with the language of the 1988 RJVA, are no longer effective.  <u>Id.</u>  All further references will be to the 1988 RJVA unless specifically otherwise noted.

---

[3]When filed electronically with the Clerk of Courts, the 1988 RJVA was for some reason divided into sub parts and marked as Exhibit L.1 through L.5. For ease of access and reference each sub part will be identified by the corresponding docket entry.

**ISSUE #2:** What rights, if any, does Viable retain as the result of these transactions?

Under Section 1., <u>Recitals</u>, the parties acknowledge:

> Bond owns the full and undivided interest in and to certain properties and rights in land in Lawrence County, South Dakota . . . [the ninety mining claims], subject only to the rights of Viable under this Agreement.

(Docket 28-16). Section 2., <u>Terms</u>, further declares:

> [T]his Agreement shall remain in force for a term of 50 years and so long thereafter as Minerals are being mined from any "Prospect" or "Venture" (as defined herein) . . . or minerals mined from any Prospect or Venture . . . are being treated on the Property for their metal values; provided, however, that this Agreement shall terminate in its relationship to all Property encompassed in any Prospect . . . if either party has only a Participation Payment interest . . . in such Prospect, in which case only those portions of this Agreement related to the definition, payment and verification of records related to such Participation Payment interest shall remain in force for such Prospect.

Section 2.1.

While the term of the 1988 RJVA is contemplated to be fifty years, or more, the parties also addressed the potential for the removal of some portion of the property from this agreement. Section 4.3, <u>Release of Property</u>, provides:

> During the course of conduct of mineral exploration under this Agreement the Manager may in its sole discretion determine that certain portions of the Property have little potential for containing minerals of economic value or will not be required for mineral development or mining facilities. Upon annual review the Manager may eliminate such portions of the Property from the terms of this Agreement, and in such event Bond will reassign any such portions to Viable.

<u>Id.</u>

15

Under Section 5.1, <u>Delineation of Prospects and Election of Viable</u>, once the Production Work Plan (during the active exploration for minerals) is completed by Manager Bond Gold, Viable has the right of election to one of the following:

> (i) to participate at the level of Participation Interest as established in Section 5.2 . . . (provided, however, that Viable may not elect participation on the basis of this Section 5.1(i) in the Richmond Hill Prospect); or

> (ii) to receive Participation Payments as defined in Section 5.3 from the production derived from such Prospect.

(Docket 28-17). Under Section 5.1(i), Viable has the right to participate with Bond Gold as a joint venturer, with the corresponding capital contribution obligation under Section 5.2, <u>Funding</u>, to contribute funds equal to 30 percent of the costs of developing and executing a production work plan. On the other hand, under Section 5.1(ii), Viable could elect instead to receive "Participation Payments" as described in Section 5.3 from any production "derived from such Prospect." <u>Id.</u>

Viable chose the participation payments option under Section 5.1(ii). As stated in Section 5.3, Viable is to receive a 15 percent participation payment for all production, except for production from the Richmond Hill Prospect.[4] For

---

[4]While a Spanish R Prospect is also delineated in the agreement, no Production Work Plan was ever developed. Development of any Prospect was solely a decision to be made by Bond Gold as the manager under the agreement. Section 4.2. (Docket 28-16).

the Richmond Hill Prospect, Viable is to receive a 7.5 percent participation payment interest. (Docket 28-18, p. 20). This occurs because the parties contemporaneously executed a Purchase Agreement (Docket 28-14) whereby Viable sold one-half of its participation payment interest in the Richmond Hill Prospect to Bond Gold. Viable contemporaneously delivered a "General Warranty Deed" (Docket 28-15) assigning one-half of Viable's participation payment interest to Bond Gold. This left Viable the right to a 7.5 percent participation payment for the Richmond Hill Prospect. (Section 5.3; Docket 28-18, p. 20).

Since Viable chose to receive only Participation Payments under Section 5.1, the manager, Bond Gold, retains all rights, duties and obligations to develop each Prospect, make the Participation Payments to Viable and provide Viable with periodic reports of the manager's progress of mining for valuable minerals. See generally Sections 4, 5, and 6. (Docket 28-16 through 19). Then upon the ultimate termination of the agreement, and after the liquidation of assets and payment of all creditors, Bond Gold is to receive any remaining funds. (Docket 28-19).

These are the principal rights and obligations of the parties under the 1988 RJVA. Other rights and obligations will be addressed where relevant to the particular issue being discussed.

**ISSUE #3:** Does Viable only have a Participation Payment interest, with no reversionary rights to the property, or is Viable's interest a transferrable expectation of a future ownership interest?

Plaintiff claims Viable has a vested interest under Section 4.3, Release of Property, requiring LAC to reassign to Viable any portion of the property which is no longer required for mineral development or mining facilities. (Docket 16 at #10). LAC claims, among other things, that:

> Since Viable only had a Participation Payment interest in the Richmond Hill Prospect, the terms of Section 4.3 of the Restated Agreement terminated as to the Richmond Hill Prospect property. As a consequence, even if the Manager had made a determination that all or a portion of the Richmond Hill Prospect property no longer had mineral potential or was no longer required for mineral development or mining facilities, the reassignment provision to Viable in Section 4.3 would not apply.

(Docket 17 at #29).

Thus the question is - what rights, if any, does Viable have or retain under Section 4.3? This is a legal question in as much as the court is required to interpret this provision of the agreement. Pauley, supra. The court is required, in applying South Dakota law, to examine the document in its entirety to determine the nature of Viable's retained rights, if any, under Section 4.3. Tripp v. F & K Assam Family, LLC, 2008 SD 78, ¶ 9, 755 N.W.2d 106, 109. See also Meyerink v. Nw. Pub. Serv. Co., 391 N.W.2d 180, 182 (SD 1986), and Northwest Realty Co. v. Jacobs, 273 N.W.2d 141, 144 (SD 1978).

The plain and ordinary meaning of the contract language will be followed unless the language is ambiguous or a different intention is manifested.

American State Bank v. Adkins, 458 N.W.2d 807, 809 (SD 1990) (citing Restatement (Second) of Contracts § 203(3) (1981)).  Whether the language of a contract is ambiguous is a question of law.  Baker v. Wilburn, 456 N.W.2d 304, 306 (SD 1990) (citing Enchanted World Doll Museum v. Buskohl, 398 N.W.2d 149, 151 (SD 1986)).  "The language in a contract may be said to be ambiguous when it is reasonably capable of being understood in more than one sense." Enchanted World Doll Museum, 398 N.W.2d at 151 (internal citations omitted). "[A] contract is ambiguous only when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  Ducheneaux v. Miller, 488 N.W.2d 902, 909 (SD 1992) (citations omitted).

Section 4.3 is clear and unambiguous.  It states in no uncertain terms that the manager, in its sole discretion, upon determining a particular piece of real property is no longer needed for mineral development or mining facilities, is to reassign such property back to Viable.[5]  Under the specific language of Section 4.3, Viable retains the right of reassignment of the patented mining claims assigned to LAC's predecessor in interest by the "Mining Deed" of July

---

[5]The issues of "sole discretion," use for "mineral development or mining facilities" and whether Viable held an assignable interest will be dealt with later in this decision.

19

18, 1985. (Docket 28-9). This is clear, not only by the language of Section 4.3, but also by the special exception reserved to Viable in the mining deed:

> SUBJECT TO:
> . . . .
> 4. Those rights to obtain a reconveyance in the property or otherwise participate in the development and mining of the same as specified in that certain Second Amendment to Option and Joint Venture Agreement dated effective May 10, 1985 . . . .

Id.

LAC claims, however, that Section 4.3, when read in conjunction with the remaining portions of the 1988 RJVA, was released when Viable chose to receive participation payments, in lieu of participating as a capital contributor to the development of the Richmond Hill Prospect. Defendant's argument must fail because Sections 2.1, 4.3, 9.2 and 9.4, when read together, compel a contrary result. Ducheneaux, supra. Section 2.1, which set the term of the agreement at fifty years or more, if read as contemplated by LAC, would be immediately terminable if Viable chose only to become a participation payment recipient under Section 5.1(ii). Such an interpretation ignores the remaining portions of the agreement and forces Section 2.1 to an absurd result. Id.

Defendant's argument is also in direct contravention of its corporate counsel's admission to Viable in a letter of December 24, 2001. (Docket 22-6). In that letter to Viable's President, Z.S. Merritt, and its attorney, Mr. Schmidt, senior legal counsel Mr. Haddock admitted "LAC owns the Property [the ninety mining claims] outright, subject only to the Viable's rights under the

Agreement." Id. Had defendant believed Viable's right to a reassignment of the mining claims was extinguished when Viable chose to receive participation payments under Section 5.1(ii), this letter from corporate counsel logically would have been the place to assert that position.

Rather, read in a logical sense and drawing on the other provisions of the agreement, Section 4.3, Release of Property, and Section 9.0, Termination; Removal of Property; Data, the length of the agreement contemplated by Section 2.1 is reduced in time only if a prospect is exhausted or no longer of any economic benefit to the parties under Section 5. This would occur since Viable, as only a participation payment recipient, would no longer be entitled to any benefit from an exhausted prospect, or if Viable or manager, for that matter, chose to terminate the agreement under Section 9.1, or withdraw under Section 9.2. In those instances, the agreement under Section 2.1 will only continue so long as necessary to complete the wrap-up and liquidation contemplated by Section 9. "It is a fundamental rule of contract construction that the entire contract, and each and all of its parts and provisions must be given meaning if that can be consistently and reasonably done." Enchanted World Doll Museum, 398 N.W.2d at 153.

Under Section 4.3, Viable retains the reversionary right to require the manager, whether it be Bond Gold or LAC, to reassign back to Viable those mining claims transferred under the 1984 JVA and the General Warranty Deed of July 18, 1985.

**ISSUE #4:** If Viable has a retained interest, is it a personal contract right or an assignable property right?

In paragraph 11 of the amended complaint, plaintiff asserts, among other things, that Viable retained the right to assign its reversionary interest under Section 4.3. (Docket 16). LAC claims in response:

> [I]f Viable held a transferrable expectation of a future ownership interest in the patented mining claims, such interest was a personal contract right under the Restated Agreement, and not a property right. It does not appear that Viable has attempted to assign any of its rights under the Restated Agreement, therefore, Fowler has no standing to assert any claim to the purported future ownership interest. Further, if Fowler asserts that Viable did assign either contract or property rights, such assignment was in violation of the terms of the Restated Agreement and was therefore void. See, Sections 11.1 and 11.2 of the RJVA.

(Docket 17 at #15).

A review of the 1984 JVA, the Mining Deed of 1985, and the 1988 RJVA leads the court to conclude the parties intended to convey a fee simple title, subject to a condition subsequent. See Swaby v. Northern Hills Regional R.R. Authority, 2009 SD 57, ¶ 30, 769 N.W.2d 798, 811. The Restatement (First) of Property § 45 (updated 2009), referenced by the court in Swaby, identifies the manner in which a fee simple estate subject to a condition subsequent is created:

> An estate in fee simple subject to a condition subsequent is created by any limitation which, in an otherwise effective conveyance of land,
>
> (a) creates an estate in fee simple; and
>
> (b) provides that upon the occurrence of a stated event the conveyor or his successor in interest shall have the power to terminate the estate so created.

"The term 'condition subsequent' denotes that part of the language of a conveyance, by virtue of which upon the occurrence of a stated event the conveyor, or his successor in interest, has the power to terminate the interest which has been created subject to the condition subsequent, but which will continue until this power is exercised." Id. at § 24.

A conveyance of real property subject to a condition subsequent does not otherwise limit the purpose of the property but subjects the property to forfeiture, or reversion, if the purposes contemplated by the conveyance are breached. Swaby, 2009 SD at ¶ 30, 769 N.W.2d at 811 (citations omitted). Here, it is clear the purpose of the assignment of these mining claims was not restricted by the grantor (Viable). Rather, through the Second Amendment of the 1984 JVA, Viable retained a reversionary interest. When LAC obtained title to the property described in the mining deed, it became the owner in fee subject to the conditions stated. Id. at 2009 SD at ¶ 35, 769 N.W.2d at 812.

This mining deed and its reference to the Second Amendment to the 1984 JVA did not create a fee simple determinable estate. "A fee simple determinable estate automatically expires upon the occurrence of the stated event, requiring no legal action to vest title in the grantors, their heirs, successors, and assigns." Id. at 2009 SD at ¶ 38, 769 N.W.2d at 813-14. Neither the agreement nor the mining deed provides that upon a specific event or date there will be an automatic reversion to Viable. Rather, when the

mining deed's purposes are exhausted, the deed specifically directs the manager to reassign the property back to Viable.

A personal contract right is one which is only for the benefit of a particular individual and not a right which is intended to be a covenant running with the land. Sprang v. Altman, 2009 SD 49, ¶ 15, 768 N.W.2d 507, 511-512. The rights granted to Viable under the mining deed (Docket 28-9) are not intended solely for Viable's benefit. The language of the mining deed is clearly intended to be a reversionary interest, not merely one to give Viable the first opportunity to repurchase the property.

As the mining deed creates a fee simple estate in the grantee, subject to a condition subsequent, the "rights to obtain a reconveyance in the property" is an interest which is reserved to Viable and its successors in interest. Swaby, supra; Sprang, supra; Restatement (First) of Property § 45 (updated 2009).

**ISSUE #5:** If Viable holds an assignable property right, is the assignment to Douglass and then Fowler in violation of the terms of the 1988 RJVA, thus rendering the assignment void?

Since Viable holds an assignable right, the next question is whether the assignment to Douglass and then Fowler is valid or in violation of the 1988 RJVA. Sections 11.1 and 11.2 specifically address the rights of the original parties to assign their interests in the agreement.

> 11.1 Assignment - Except as provided in Section 11.3 below [not relevant to this current analysis], neither party shall assign its rights in the Agreement or the Property without the prior written consent of the other party, which consent shall not be unreasonably withheld. This provision shall not apply to sales and assignments to any

Affiliate of the parties. "Affiliate" means any person, partnership, corporation, or other form of enterprise which directly or indirectly controls, is controlled by, or is under the common control with, a Participant. For purposes of the preceding sentence, "Control" means possession, directly or indirectly of the power to direct or cause direction of management and policies through ownership of voting securities, contract, voting trust, or otherwise.

11.2 <u>Right of First Refusal</u> - Except as provided in Section 11.3 below [not relevant to this current analysis], if either party receives a bona fide offer to sell or otherwise transfer all or a portion of its respective interest in the Property, the Agreement, any Venture, Prospect, or any share of production, it is expressly understood that the other party will have the first right to accept such offer for a cash equivalent of one hundred and ten percent (110%) of the offer within thirty (30) days after receipt of written notice containing the written terms of such offer. This provision shall not apply to any transfer to an affiliate as defined above.

(Docket 28-19). The language, purpose and intent of Sections 11.1 and 11.2

are clear and unambiguous as they are only subject to one interpretation.

<u>Enchanted World Doll Museum</u>, <u>supra</u>, and <u>Ducheneaux</u>, <u>supra</u>.

Under these provisions neither party could assign their interest in either

the property or this agreement without the advance written consent of the

other party. The only exception is the assignment to an affiliate of the

assignor.[6] If a sale or assignment to anyone other than an affiliate is to occur,

the party intending to complete that transaction must first give the other party

to the agreement written notice of the terms of the outstanding offer and the

opportunity to match the offer by paying 110 percent of the third-party offer.

_____

[6]Obviously, the affiliate exception was used by St. Joe Gold when by corporate name changes and mergers St. Joe Gold became St. Joe Richmond Hill, then Bond Gold, then Richmond Hill, then LAC Minerals and finally LAC.

Thus, at this juncture there are additional questions which must be resolved before the ultimate question can be answered. Those additional questions are:

1. Was Viable's assignment to Douglass and then to Fowler to an affiliate as defined in Section 11.1?

2. If the answer to question #1 is "no," then the next question is - was Bond Gold (or its date appropriate successor in interest) given notice of its right to exercise the right of first refusal under Section 11.2?

3. If the answer to question #2 is "no," did Bond Gold (or its date appropriate successor in interest) give written consent for the transfer to Douglass and then to Fowler?

4. If the answer to question #2 is "yes," did Bond Gold (or its date appropriate successor in interest) waive the right of first refusal under Section 11.2?

5. If the answer to question #2 is "yes," and the answer to question #3 is "no," did Bond Gold (or its date appropriate successor in interest) reasonably withhold consent under Section 11.1?

Plaintiff asserts Dakota Minerals, Inc. ("Dakota Minerals"), as the original owner of the ninety mining claims, transferred the property to Viable for shares of Viable stock, so that Dakota Mineral became the largest single shareholder of Viable. (Docket 33 at #2 and #3). LAC disputes this factual assertion by a general denial. (Docket 36 at #3). Plaintiff further asserts that Douglass, while holding the option to purchase Viable's interest in the ninety mining claims, also acquired the assets of Dakota Minerals from the bankruptcy trustee and

then sold all of his Viable stock to Fowler. (Docket 33 at #14). LAC disputes this factual assertion by a general denial. (Docket 36 at #14). Douglass then conveyed his interest in the ninety mining claims to Fowler by quitclaim deed on November 14, 1999. (Docket 33 at #14). Defendant admits this factual statement. (Docket 36 at #14). Plaintiff represents that Douglass was an affiliate of Viable as contemplated by the 1988 RJVA. (Docket 33 at #14). LAC disputes this factual assertion by a general denial. (Docket 36 at #14).

However, for each of its denials relevant to this section, LAC simply asserts it is without knowledge or information to form a belief as to the truth of the statements made and thus denies those factual allegations by plaintiff. Defendant does not provide the court with any reference to the record to dispute plaintiff's factual assertions as required by Fed. R. Civ. P. 56(e)(2) and D.S.D. LR 56.1(D). Rule 56(e)(2) specifically provides:

> [A]n opposing party may not rely merely upon allegations or denials in its own pleadings; rather, its response must--by affidavit or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

In similar fashion, D.S.D. LR 56.1(D) requires "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." Of interest to the court, however, defendant makes some collateral and relevant factual statements in support of its own motion for

summary judgment.  (Docket 26).  Those statements of fact presented by the

defendant pertinent to the current issue are as follows:

a.  In an Option to Purchase dated November 15, 1995, Viable granted Donn C. Douglass the option to purchase Viable's "Residual and Reassignable Interest" in the Carbonate Properties (including the ninety patented mining claims, Viable had previously conveyed to LAC's predecessors) (the "Douglass Option").  (Docket 26 at #28).

b.  The Douglass Option stated that "Viable's Residual and Reassignable Intrerest (sic) in the properties is reiterated and reaffirmed in Section 4.3 of the [1988 RJVA]." <u>Id.</u>

c.  The Douglass Option set the purchase price for the "Residual and Reassignable Interest" at $15,000 and stated that the purchase price "represensts (sic) a fair payment for a right which may, or may not develop, and which payment may be in risk of total loss if no properties are reassigned to Viable." <u>Id.</u>

d.  The Douglass Option was recorded in the Office of the Lawrence County Register of Deeds on January 21, 1997, as Doc. No. 97-244.  (Docket 26 at #29).

e.  By quitclaim deed dated October 15, 1997, Viable quitclaimed the Carbonate Properties to Donn C. Douglass.  (Docket 26 at #30).

f.  Donn C. Douglass quitclaimed the Carbonate Properties to Robert G. Fowler by a quitclaim deed dated November 14, 1999.  (Docket 26 at #31).

g.  The property in dispute consists of ninety mining claims comprising of approximately 944 acres ("Property").  (Docket 36 at #2).

It is not of consequence to the court when and by whom these ninety mining claims were initially acquired because the parties both acknowledge these claims were, at the time period relevant to this litigation, owned by Viable which then assigned the reversionary rights to Douglass and then Fowler. This having been said, the first question which remains unresolved and disputed as both factual statements and legal conclusions is whether Douglass and then Fowler were affiliates of Viable as defined in Section 11.1. All of the other questions posed on page 26 are driven by the answer to the affiliation question and are likewise unresolved factual disputes between the parties. Thus, under Rule 56, summary judgment is denied as to both parties on this issue.

**ISSUE #6:** <u>If the Viable interest is assignable to Fowler, what is the South Dakota statute of limitations which applies to enforcement of the interest</u>?

If it is ultimately determined by the court that Viable's interest in the 1988 RJVA is assignable, ultimately to Fowler, the next legal issue for resolution is the applicable statute of limitations.

Defendant asserts plaintiff's claims are time barred. Specifically, defendant argues that plaintiff's separate claims are subject to the following statutes of limitation:

1. Declaratory judgment--6 years;
2. Specific performance--10 years; and
3. Quiet title action--10 years.

(Docket 27 at pp. 22-23). The South Dakota Supreme Court resolved the question of which statute of limitation is applicable to this proceeding in <u>Swaby</u>

v. Northern Hills Regional R.R. Authority, 2009 SD 57, 769 N.W.2d 798.

Swaby was decided after defendant's brief was submitted. Specifically, Swaby declared that the Marketable Title Act, SDCL 43-30-3, and the statute of limitations of SDCL 15-3-3 do not apply to cause the expiration of conditions subsequent. Swaby, 2009 SD at ¶ 34, 769 N.W.2d at 812. The court pointed out that under SDCL § 43-30-12, "[t]his chapter shall not be applied to bar . . . conditions subsequent in any deed." Id.

Next, the Swaby court determined, "unlike other states, South Dakota has no statute of limitations specifically related to breaches of conditions subsequent." Id. (references to other states omitted). The Swaby court further declared, "[m]oreover, SDCL 15-3-3 does not bar a claim for re-entry upon a breach of a condition subsequent. Rather, it provides the statutory time for a landowner to take land back from someone attempting to establish adverse possession." Id. (citing to Rotenberger v. Burghduff, 2007 SD 19, ¶ 18, 729 N.W.2d 175, 180-81). When LAC obtained title to the property described in these deeds, it became the owner in fee subject to the conditions stated. Swaby, 2009 SD at ¶ 35, 769 N.W.2d at 812.

Assuming for purposes of argument that defendant's hostile possession began in 1993 when mining concluded on the Richmond Hill Prospect, LAC cannot assert a claim of adverse possession. "It is not conceptually logical for the grantee of a fee estate subject to a condition subsequent to acquire an

indefeasible estate simply by remaining in possession of the property following breach of the condition. His continued possession and enjoyment of the property does not become adverse to any possessory estate of the grantor until the latter, or his heirs, elect to declare a forfeiture." Id. at footnote 25 (internal citation omitted).

Therefore, the statute of limitations has not expired on a condition subsequent which, by contract, has a potential period of continuation of fifty years. Section 2.1; Swaby, supra. Plaintiff's collateral claims for declaratory judgment (that defendant has a duty to reconvey the property under Section 4.3) and specific performance (for reconveyance under Section 4.3) are likewise not time barred under the authority of Swaby.

**ISSUE #7:**   Has LAC acted in good faith under the 1988 RJVA in its decision
        relating to the release of property from that agreement?

Plaintiff claims LAC acknowledged to both Viable and Fowler a duty to reassign any portion of the property not used by LAC for mineral development or mining facilities. LAC specifically denies that it or its representatives ever made such a representation. Plaintiff further claims LAC, through its representatives, indicated an intention to make a reassignment to Viable and/or Fowler of unnecessary real property from time to time. LAC specifically denies that any such representations were, in fact, made to either Viable or Fowler.

31

This issue is disputed by the parties both as to these factual statements and the legal conclusions to be drawn therefrom. Thus, under Rule 56, summary judgment must be denied as to both parties on this issue.

**ISSUE #8:** <u>Is LAC obligated at this time under the 1988 RJVA to release property to Fowler</u>?

Defendant's Undisputed Material Facts contain the following statements not denied by plaintiff. All mineral exploration and mining for precious metals at the Richmond Hill Mine ceased in 1993. (Docket 26 at #38 and #39). The map of the Richmond Hill Mine (Docket 30) shows the locations of the following:

a. Mine permit boundary.
b. Water collection and storage ponds.
c. Water treatment facilities.
d. Ground water and surface water monitoring sites.
e. Acid rock drainage ("ARD") areas that have been capped, sealed, and/or reclaimed.
f. Capped, sealed and reclaimed heap leach pads.
g. Limestone, rock, and clay resources.
h. Sludge disposal pond.
i. Other areas affected by recent mining operations.
j. Historic mine workings.
k. Adjacent property owned by Scott L. Prentice and Jeanne L. Prentice.
l. Private roads.
m. The ninety patented mining claims purchased from Viable.
n. The Richmond Hill Prospect area.
o. Aquatic monitoring sites.
p. Lands recently purchased or leased from other parties.

(Docket 26 at #34). The surfaces of the capped, sealed and reclaimed ARD areas and heap leach pads cannot be disturbed. (Docket 26 at #35). Any

32

surface disturbances of the capped and sealed areas would penetrate the clay and/or geosynthetic seals, allowing water and air to enter.  Id.  Water and air would increase ARD, cause problems with water quality and impact aquatic resources.  Id.  Disturbance of other reclaimed areas could contribute to the release of poor quality water.  Id.

The following operations are still being conducted on the lands acquired from Viable (the ninety patented mining claims):

a.    Ground water and surface water monitoring.
b.    Reclamation.
c.    Aquatic monitoring.
d.    ARD mitigation and containment.
e.    Water collection and storage.
f.    Performance monitoring on the capped, sealed and reclaimed ARD areas and leach pads.
g.    Site security and maintenance, including storm water control.
h.    Water treatment.

(Docket 26 at #41).  Lawrence County requires a minimum buffer zone of 500 feet between lands disturbed by mining and adjacent or adjoining landowners. (Docket 26 at #42).

Because plaintiff failed to comply with D.S.D. LR 56.1B, defendant's statement of material facts must be accepted as true.  However, Issue #8 remains unresolved because the court cannot determine which portion of the real property, if any, is not necessary for post-mining and reclamation purposes.  Thus, a material fact is in dispute, as are the legal conclusions to be

drawn therefrom. Under Rule 56, summary judgment is denied to both parties on this issue.

Based upon this opinion, it is hereby

ORDERED that plaintiff's motion for summary judgment (Docket 20) is granted in part and denied in part.

IT IS FURTHER ORDERED that defendant's motion for summary judgment (Docket 24) is granted in part and denied in part.

IT IS FURTHER ORDERED that, as addressed in Issue #1, the 1988 Restated Joint Venture Agreement superseded the 1984 Joint Venture Agreement and any changes from the earlier documents, when compared with the language of the 1988 Restated Joint Venture Agreement, are no longer effective.

IT IS FURTHER ORDERED that, as addressed in Issue #2, under the 1988 Restated Joint Venture Agreement, Viable is to receive a 7.5 percent participation payment interest in the Richmond Hill Prospect.

IT IS FURTHER ORDERED that, as addressed in Issue #2, under the 1988 Restated Joint Venture Agreement, Bond Gold, and its successors-in-interest, as manager retains all rights in the Richmond Hill Prospect including, but not limited to, retention of any funds remaining after liquidation of assets and payment of all creditors.

IT IS FURTHER ORDERED that, as addressed in Issue #3, Viable retains the reversionary interest in the ninety mining claims.

IT IS FURTHER ORDERED that, as addressed in Issue #4, the ninety mining claims are subject to a condition subsequent requiring the manager to reassign the property back to Viable, and its successors-in-interest, when the mining deed's purposes are exhausted.

IT IS FURTHER ORDERED that, as addressed in Issue #5, summary judgment is denied to both parties.

IT IS FURTHER ORDERED that, as addressed in Issue #6, plaintiff's claims are not time barred.

IT IS FURTHER ORDERED that, as addressed in Issue #7, summary judgment is denied to both parties.

IT IS FURTHER ORDERED that, as addressed in Issue #8, summary judgment is denied to both parties.

IT IS FURTHER ORDERED that the parties shall file a joint scheduling proposal on or before **October 14, 2010**, addressing the following:

1.  The amount of time necessary to complete discovery;

2.  The number of trial days anticipated for presentation of evidence; and

3.  Proposed trial dates workable for the parties and their witnesses.

Dated September 14, 2010.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE