UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| ROBERT G. FOWLER, | ) | CIV. 08-5043-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER FOLLOWING |
| vs. | ) | COURT TRIAL |
| | ) | |
| LAC MINERALS (USA), LLC, a | ) | |
| Delaware limited liability | ) | |
| company, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the amended complaint of plaintiff Robert G. Fowler and the counterclaim of defendant LAC Minerals (USA), LLC ("LAC"). Plaintiff's amended complaint (Docket 16) contains claims for declaratory judgment, specific performance and quiet title. The defendant's counterclaim (Docket 17) asserts claims for declaratory judgment and quiet title–all relating to the same ninety mining claims and documents relating to that real estate. The court entered an order on cross motions for summary judgment (Docket 46) which resolved a number of issues and identified those issues to be resolved at trial. The undisputed material facts and the issues resolved in the order on cross motions for summary judgment (Docket 46) are incorporated by reference. A chronological description of events and transactions between the parties is set out in Docket 46 and will not be fully repeated here.

A court trial was held on February 1 and 2, 2011, at which Mr. Fowler was represented by his attorney Harlan Schmidt.  LAC appeared through its site manager, Todd Duex, and its attorneys Max Main and Dwight Gubbard. The court, after considering the deposition transcripts and exhibits, together with the trial testimony of Mr. Fowler and Mr. Duex, entered the following findings of fact and conclusions of law on the unresolved issues.[1]

**ISSUE #5:**  Since Viable holds an assignable right, is the assignment from Viable to Douglass and then to Fowler in violation of the terms of the 1988 RJVA,[2] thus rendering the assignment void?

Stated another way, is the assignment from Viable to Mr. Douglass and then to Mr. Fowler valid or in violation of the 1988 RJVA?  Sections 11.1 and 11.2 of the 1988 RJVA specifically address the rights of the original parties to assign their interests in the agreement.

> 11.1 Assignment - Except as provided in Section 11.3 below [not relevant to this current analysis], neither party shall assign its rights in the Agreement or the Property without the prior written consent of the other party, which consent shall not be unreasonably withheld. This provision shall not apply to sales and assignments to any Affiliate of the parties.  "Affiliate" means any person, partnership, corporation, or other form of enterprise which directly or indirectly controls, is controlled by, or is under common control with, a Participant.  For purposes of the preceding sentence, "Control" means possession, directly or indirectly of the power to direct or cause direction of management and policies through ownership of voting securities, contract, voting trust, or otherwise.

---

[1]The same abbreviations and short names used in the previous order will be used here for the convenience of the parties.  An unresolved issue which is clarified by an earlier resolved issue will be modified for continuity purposes.

[2]"RJVA" is a reference to the Restated Joint Venture Agreement of December 2, 1988.

> 11.2 <u>Right of First Refusal</u> - Except as provided in Section 11.3 below [not relevant to this current analysis], if either party receives a bona fide offer to sell or otherwise transfer all or a portion of its respective interest in the Property, the Agreement, any Venture, Prospect, or any share of production, it is expressly understood that the other party will have the first right to accept such offer for a cash equivalent of one hundred and ten percent (110%) of the offer within thirty (30) days after receipt of written notice containing the written terms of such offer.  This provision shall not apply to any transfer to an affiliate as defined above.

(Docket 28-20 at pp. 15 & 16).  The court previously ruled the language, purpose and intent of Sections 11.1 and 11.2 are clear and unambiguous as they are only subject to one interpretation.  (Docket 46, p. 25).  Under these provisions neither party could assign their interest in either the property or the agreement without the advance written consent of the other party, except where the assignment is to an affiliate of the assignor.

At trial, Mr. Fowler testified about his lifelong experience and career in the mining industry.  His experience includes creating a number of startup companies and taking public a number of other companies.  Mr. Fowler was one of the original organizers of Viable.  He testified he had the mining expertise and experience to put Viable into productive precious metal properties and the Viable board of directors and officers looked to him for guidance.

3

To create capital for the company, Mr. Fowler and others[3] took Viable public in 1981. (Trial Exhibit 1). Mr. Fowler testified he was an affiliate of Viable because he held more than 10 percent of its stock, either personally or as an officer and director of Dakota Minerals. The prospectus issued as part of Viable's public stock offering disclosed Mr. Fowler controlled 49.3 percent of the Viable stock through his personal stock holding and his interest in Dakota Minerals. Id.

Dakota Minerals, another company in which Mr. Fowler was a significant participant, originally developed the 944 acres upon which the ninety mining claims existed. As part of its own restructuring, Dakota Minerals transferred the ninety mining claims to Viable in exchange for shares of Viable stock. After that transaction, Dakota Minerals became the single largest shareholder of Viable common stock. When Dakota Minerals filed bankruptcy,[4] the trustee held 1,440,000 shares of common stock in Viable. (Trial Exhibit 13). It also acquired 85,000 Viable common stock shares from Mr. Fowler in satisfaction of a judgment Dakota Minerals secured against him in 1989. Id.

---

[3]Mr. Z. S. Merritt was the secretary, treasurer, director and organizer of Viable. See Trial Exhibit 1. Mr. Merritt's deposition is part of the record and will be addressed later.

[4]In re Dakota Minerals Inc., Case No. 85-00073-BA, United States Bankruptcy Court for the District of Wyoming.

4

Mr. Fowler and Mr. Douglass met and became friends in the 1970s.  Mr. Fowler testified, in addition to their work in a number of earlier business ventures, Mr. Douglass was acting as his agent in the transactions relevant to this case.  In the year prior to the activities described below, Mr. Fowler authorized Mr. Douglass to try to acquire Dakota Minerals and its Viable stock so the ninety mining claims could be reacquired by Mr. Fowler.[5]  Mr. Fowler testified he understood the affiliate requirements of Section 11.1 of the 1988 RJVA.  He and Mr. Douglass always kept the affiliate requirements in mind as they developed their plan to reacquire the ninety mining claims.

On November 15, 1995, Mr. Douglass acquired an option to purchase Viable's residual and reassignable interests in the 1988 RJVA.  (Trial Exhibit 123).  Those residual and reassignable interests included the ninety mining claims.  Id. at Exhibit A.  The option also specifically referenced the reassignment rights delineated in Section 4.3 of the 1988 RJVA.  Id. at Exhibit B.  The option to purchase was later extended by agreement.  (Trial Exhibit 10).  On October 15, 1997, while the extension of the option was pending, Viable

_____

[5]Mr. Fowler testified he and Mr. Douglass originally planned to develop the ninety mining claims together, but Mr. Douglass developed cancer and died on February 27, 2000.  Their relationship was based upon an oral agreement, with no written power of attorney, joint enterprise agreement, or other partnership documentation.

5

executed a quitclaim deed assigning the ninety mining claims to Mr. Douglass.[6] (Trial Exhibit 11).  Mr. Douglass paid $2,500 at the time of the option and, with additional installment payments, paid a total of $7,500 to Viable.

The bankruptcy trustee offered the assets of Dakota Minerals for sale to the public in 1998 as part of the liquidation of the company's assets.[7]  Id.  Mr. Douglass was the highest bidder for the Viable stock and purchased it for $800 from the bankruptcy trustee in the summer of 1998.

Mr. Douglass transferred the Viable stock and ninety mining claims to Mr. Fowler in two separate transactions.  Mr. Douglass signed a quitclaim deed dated November 14, 1999, which transferred the ninety mining claims.  (Trial Exhibit 19).   A separate assignment, bill of sale and conveyance was executed by Mr. Douglass on January 13, 2000, which transferred the Viable stock to Mr. Fowler.  (Trial Exhibit 20).

As part of the transaction, Mr. Fowler paid the remaining $7,500 due Viable under the Douglass option, $7,500 to Mr. Douglass for the funds he had previously paid to Viable, and an additional $800 for the money paid by Mr. Douglass to the Dakota Minerals bankruptcy trustee.  On May 17, 2000, on

---

[6]Delivery of this quitclaim deed occurred at a later date.  See page 8. infra.

[7]Although this was a public liquidation sale by the Wyoming bankruptcy trustee, for whatever reason LAC chose not to participate in the bidding process.

6

behalf of Viable, Mr. Z. S. Merritt signed a receipt for full payment of the option to purchase originally held by Mr. Douglass and subsequently assigned to Mr. Fowler.  (Trial Exhibit 21).

Mr. Merritt's deposition was offered by the parties at trial.  (Dockets 74 & 75).  Mr. Merritt testified he and Mr. Fowler founded Viable to acquire and develop mineral properties, including the mining claims Mr. Fowler had been accumulating since 1978 as president of Dakota Minerals.  (Docket 61-2, p. 6:1-3).  Mr. Fowler was Viable's first president and Mr. Merritt its third president.  Id. at lines 4-5.  Mr. Merritt negotiated the 1988 RJVA with LAC's predecessor.  Id. at line 17-21.  After executing the 1988 RJVA, Viable filed for bankruptcy the next month.  Id. at lines 22-24.

Mr. Merritt acknowledged that Mr. Fowler, as president of Dakota Minerals, accumulated the ninety mining claims from 1969 to 1977.  Id. at p. 8:16-25.  Viable exchanged $1.5 million of stock for the mining claims from Dakota Minerals.  Id. at p. 9:1-3.  Dakota Minerals received 1.5 million shares of Viable stock, which was about 11 or 12 percent of Viable's outstanding stock, and Dakota Minerals became the largest shareholder in Viable.  Id. at lines 9-12.  Dakota Minerals was a "very influential stockholder dominating other interests."  Id. at line 12-13.

Mr. Merritt knew Mr. Douglass wanted an option from Viable for its reversionary rights to the mining claims and also intended to acquire the Viable stock held by Dakota Minerals, which was in bankruptcy.  Id. at

7

p. 10:9-11.  By acquiring Viable stock through the Dakota Minerals bankruptcy, Mr. Douglass became the largest Viable stockholder and that status, coupled with his close relationship with Mr. Fowler and the other Viable shareholders, made Mr. Douglass "very influential in the relationship."  Id. at p. 16:1-5.

After Mr. Douglass acquired the Viable stock from the Dakota Minerals bankruptcy, he gave Mr. Merritt notice of his intent to exercise the option.  Id. at p. 12:8-11.  Mr. Douglass agreed to pay at a later date the remaining $7,500 balance due on the option, so Mr. Merritt agreed and delivered the Viable quitclaim deed for the ninety mining claims to Mr. Douglass.  Id. at lines 11-16.  Delivery of the quitclaim deed occurred in October of 1998 or early 1999.[8] Id. at pp. 12:15-16 and 17:12-13.  Mr. Fowler ultimately paid the remaining $7,500 balance due to Viable.  (Docket 61-2, pp. 12:17-21 and 13:1-2).

The court finds Mr. Fowler's testimony credible.  This determination is based on Mr. Fowler's testimony describing his mining experience, his personal involvement in both Viable and Dakota Minerals, his relationship with Mr. Douglass, the exhibits admitted at trial on these issues, and the deposition testimony of Mr. Merritt.

---

[8]The quitclaim deeds from Viable to Mr. Douglass and from Mr. Douglass to Mr. Fowler were both filed with the Lawrence County Register of Deeds on October 11, 2001.  (Trial Exhibits 11 and 19).

The court finds both Mr. Douglass and Mr. Fowler were affiliates of Viable as contemplated by Section 11.1 of the 1988 RJVA.  Mr. Douglass was a Viable affiliate as an individual shareholder through the Dakota Minerals acquisition and as Mr. Fowler's agent.  Together with Mr. Fowler, Mr. Douglass controlled or was in common control of Viable.  Mr. Fowler, directly or indirectly, was an affiliate of Viable because of his separate stockholding and with the stock held by Mr. Douglass as his agent.  Mr. Fowler had the power to direct or control direction of Viable's management and its policies.  His Viable stock ownership and the expertise he brought to the corporation allowed him to influence or direct corporate management.

LAC filed a pretrial motion to dismiss Mr. Fowler's complaint for lack of standing.  (Docket 53).  LAC argues SDCL § 43-4-3 prohibits an assignment of the condition subsequent from Viable to Douglass to Fowler.  Id. at p. 1.   That statute provides in part that "[a] mere right of reentry, or of repossession for breach of a condition subsequent, cannot be transferred to anyone except the owner of the property affected thereby."   SDCL § 43-4-3.

LAC relies on Rowbatham v. Jackson, 5 N.W.2d 36 (S.D. 1942) for its argument.  (Docket 54, p. 5).  The South Dakota Supreme Court in Rowbatham focused on the very restrictive nature of the language of the contract provision in question in that case.  The language was "[i]f these restrictions be in any way violated, or not fully complied with in the event of any building being placed on

said lot, then all right and title shall revert to the grantors without process of law." Id. at 37. The court concluded "[t]he reverter language used . . . pertains to [a single lot] and for and during the lifetime of the grantors. It does not purport to be made for the benefit of any other person." Id. "No further provision has been made and there is absolutely nothing in the evidence to indicate that this provision was made for the benefit or for the protection of the adjoining contiguous property . . . . We are unable to say that this provision is tied up with the title to the property." Id. The deed did "not contain any expressed covenant, stipulation or agreement in reference to [the contiguous lot]. It would therefore seem that the restrictions were not intended to run with the land." Id. at 38. The South Dakota Supreme Court found this language was contrary to deeds where a restriction is intended to run with the land. "[T]he grantee did not enter into any covenant or agreement restricting his rights in the premises . . . or that a general plan or scheme of restrictions was contemplated as to such tract; and there is nothing to indicate that such restrictions were intended to run with the land . . . ." Id. (internal citation omitted). The court concluded the language in the Rowbotham deed was only a "mere possibility of interest" and could only be transferred to the owner of the property affected by the restriction under the language of the predecessor of SDCL § 43-4-3. Id.

The language in the 1988 RJVA (Trial Exhibit 119), as a restatement of the 1984 JVA (Trial Exhibit 109), the Mining Deed dated July 18, 1985, conveying eighty-nine of the mining claims to LAC's predecessor-in-interest, (Trial Exhibit 112), and the February 24, 1987, conveyance of the ninetieth mining claim, the Mars No. 1 patented mining claim of M.S. 1851 (Trial Exhibit 114), all clearly establish that the intent of the reversionary rights retained by Viable were intended to run with the land.  Were the intent of the reversionary rights paragraph not intended to run with the land, there would have been no purpose for Section 11.1 of the 1988 RJVA.  That section specifically allows Viable to transfer those rights to someone other than LAC, so long as the transferee was an affiliate of Viable.  If LAC's argument was correct, that is, the reversionary rights cannot be transferred to anyone other than LAC, Section 11.1 would have no meaning or purpose.  "The contract is to be read as a whole, making every effort to give effect to all provisions. . . . When the words of a contract are clear and explicit and lead to no absurd consequences, the search for the parties' common intent is at an end."  Nelson v. Schellpfeffer, 2003 S.D. 7, ¶ 8, 656 N.W.2d 740, 743.  See also Enchanted World Doll Museum v. Buskohl, 398 N.W.2d 149, 152 (S.D. 1986) ("It is a fundamental rule of contract construction that the entire contract, and each and all of its parts and provisions must be given meaning if that can be consistently and reasonably done.").

A covenant running with the land, like this condition subsequent, is transferrable.  See SDCL § 43-25-18.[9]  See also Swaby v. Northern Hills Regional R.R. Authority, 2009 S.D. 57, 769 N.W.2d 798, for an excellent discussion of condition subsequent.

LAC's motion to dismiss Mr. Fowler's complaint for lack of standing (Docket 53) is denied.  The assignments of the ninety mining claims from Viable to Mr. Douglass to Mr. Fowler were in compliance with the affiliate provision Section 11.1 of the 1988 RJVA.  The assignment of the ninety mining claims to Mr. Fowler was a valid transfer under Section 11.1 of the 1988 RJVA.

**ISSUE #7:**  Has LAC acted in good faith under the 1988 RJVA in its decision relating to the release of property from that agreement?

The 1988 RJVA addresses the potential for the removal of some portion of the property from the agreement.  Section 4.3, Release of Property,  provides:

> During the course of conduct of mineral exploration under this Agreement the Manager may in its sole discretion determine that certain portions of the Property have little potential for containing minerals of economic value or will not be required for mineral development or mining facilities. Upon annual review the Manager may eliminate such  portions of  the Property from the terms of this

---

[9]"Where a grant is made upon condition subsequent, and is subsequently defeated by the nonperformance of the condition, the person otherwise entitled to hold under the grant must reconvey the property to the grantor or his successors, by grant duly acknowledged for record."  SDCL § 43-25-18.

Agreement, and in such event Bond will reassign any such portions
to Viable.

(Trial Exhibit 119, p. 6).

On November 19, 1997, Mr. Duex wrote to Mr. Merritt who was then

president of Viable.  (Trial Exhibit 12).

> [W]ater treatment at the site using the reverse osmosis system will
> continue for probably two more years.  A long term water
> management and treatment plan must then be developed and
> approved by the State of South Dakota.  Management of the
> draindown [sic] from the leach pads is expected to require LAC's
> presence on the property for a number of years.  Once all of the water
> related issues are resolved, the facilities must be removed and the
> area re-vegetated.  At least three years worth of vegetation monitoring
> data will have to be collected prior to final bond release.
>
> LAC is diligently working towards completion of the reclamation plan
> at the Richmond Hill mine site and continues to work with the State
> in closing the property.  Nonetheless, LAC will be obligated by the
> various permit conditions to continue an active presence on the
> property for the foreseeable future. . . .

Id.

In the spring of 1998, Mr. Duex sent another letter to Mr. Merritt.  (Trial

Exhibit 14).  Among other things, the letter reported that out of the 320 acres

which had been disturbed during mining, 212 acres had thus far been

reclaimed.  Id. at  p. 1.  The property still requiring reclamation "must remain

in place until a long-term water management plan can be developed and

approved by the State of South Dakota.  This plan has not been developed and

it is not known at this time whether active water treatment will continue at the

Richmond Hill Mine Site for the long term."  Id.  Concerning the long term water management plan, Mr. Duex wrote:

> Studies have shown that effluent from the leach pads will not meet either groundwater or surface water quality for the foreseeable future. Therefore, the water management plan must account for the long term drainage from the leach pads in an environmentally sound manner. . . . If an alternative is not available, long term active water treatment . . . may have to continue.

Id. at p. 2.

Mr. Fowler and Mr. Merritt were part of a group which met with Mr. Duex and LAC's attorney, Mr. Main, on July 14, 1999, and again on August 18, 1999.  (Trial Exhibits 15 & 16).  Mr. Fowler wrote a letter to the landowners in attendance at the August 18 meeting.  (Trial Exhibit 17).  The focus of the meeting was the landowners' concern about LAC reclamation at the mining site, the need for new road construction and whether any changes to the South Dakota Department of Environment and Natural Resources reclamation agreement with LAC could be accomplished.  Id.

On October 11, 2001, Viable formally requested LAC perform an annual release of "such mineral interests as are not being used for mining or mining operations and that [LAC] reassign such portions to Viable."  (Trial Exhibit 28). On December 24, 2001, LAC responded asserting the 1988 RJVA was misread. (Trial Exhibit 131).  LAC's response was as follows:

> Section 4.3 provides that during the course of exploration, the Manager "*may in its sole discretion*" determine that portions of the Property are no longer useful and annually *may* eliminate such

14

> properties from the Agreement by reassigning them to Viable. The
> section does not require that LAC release or assign any mineral
> interests and gives Viable no right to demand such an assignment.
> Moreover, even if the Agreement did require the release of unneeded
> properties, LAC notes that all of the Property is needed and useful to
> its current operations and will be until reclamation and closure
> activities are finalized and all bonds are released.

Id. (emphasis in original). In summary, LAC concluded "[w]hatever those rights [in Viable] may be, they do not include the right to demand an assignment of any portion of the Property." Id. at p. 2.

On July 17, 2003, Barrick (the ultimate parent corporation of LAC) gave notice to Mr. Fowler of LAC's intent to abandon its interests in a number of Bureau of Land Management ("BLM") unpatented mining claims.[10] (Trial Exhibit 33). LAC offered these claims to Viable so that Viable could take over the $100 annual fee per claim which was payable to BLM.[11] Id. Mr. Fowler took this offer from LAC as an intent to release some of the ninety mining claims at the same time. LAC clarified its position by a letter of July 22, 2003. (Trial Exhibit 34). The letter advised:

> By no means is the letter in respect to the abandonment of claims [of
> July 17, 2003] intended to be a "release of properties." It is simply a
> courtesy to your client to have the opportunity to take these
> claims. . . . we are completing an indepth [sic] review of the Richmond

---

[10]Those mining claims are described in Trial Exhibit 32. None of these mining claims are part of the ninety mining claims which are the particular focus of this litigation.

[11]Mr. Fowler was not interested in saving those unpatented mining claims. (Trial Exhibit 35, p. 4).

> Hill project in order to, in addition to other matters, determine which properties may be nominated for release. In the course of such review it became apparent to us that we have no need to maintain these particular unpatented claims and that they should be surrendered prior to the due date for payment of maintenance fees.

Id. Regarding the ninety mining claims, LAC stated "[w]e are making great strides in determining which fee properties may be released . . . . I think it is wise and will serve all of us well to be prudent and diligent in our review rather than to be too hasty." Id.

Todd A. Duex began working as an exploration geologist at the Richmond Hill Mine in November 1984. His responsibilities to the present time have included the positions of exploration manager, project manager for permitting and development, chief geologist, environmental superintendent, and site manager. As site manager, Mr. Duex is charged with the duty to supervise the reclamation and ultimate closure of the Richmond Hill Mine.

The map of the Richmond Hill Mine, shows the locations of the following:

    a.    Mine permit boundary.
    b.    Water collection and storage ponds.
    c.    Water treatment facilities.
    d.    Ground water and surface water monitoring sites.
    e.    Acid rock drainage ("ARD")[12] areas that have been capped, sealed, and/or reclaimed.
    f.    Capped, sealed and reclaimed heap leach pads.
    g.    Limestone, rock, and clay resources.
    h.    Sludge disposal pond.
    i.    Other areas affected by recent mining operations.

---

[12]Acid rock drainage and acid mineral drainage ("AMD") are used interchangeably.

j.     Historic mine workings.
k.     Adjacent property owned by Scott L. Prentice and
       Jeanne L. Prentice.
l.     Private roads.
m.     The ninety patented mining claims purchased from
       Viable.
n.     The Richmond Hill Prospect area.
o.     Aquatic monitoring sites.
p.     Lands recently purchased or leased from other parties.

(Trial Exhibit 101). Mr. Duex testified, and it is undisputed, the surfaces of the capped, sealed and reclaimed acid rock drainage ("ARD") areas and heap leach pads cannot be disturbed. Those capping systems are a "pit impoundment," illustrated top-to-bottom as follows:

vegetation/grass

topsoil

thermal barrier

non-acid generating bentonite

limestone compact

acid material compacted

Any surface disturbance of the capped and sealed areas may penetrate the clay or the thermal barrier (a geosynthetic seal), allowing water and air to enter. Water and air exposure will increase ARD, magnify problems with water quality and impact aquatic resources. Disturbance of other reclaimed areas could contribute to the release of poor quality water into the surrounding water shed and ground water.

17

As of the time of trial, the following operations were still being conducted on the ninety patented mining claims:

a.  Ground water and surface water monitoring.
b.  Reclamation.
c.  Aquatic monitoring.
d.  ARD mitigation and containment.
e.  Water collection and storage.
f.  Performance monitoring on the capped, sealed and reclaimed ARD areas and leach pads.
g.  Site security and maintenance, including storm water control.
h.  Water treatment.

Mr. Fowler acknowledged reclamation is continuing.[13]

Mr. Duex described in detail the various watersheds surrounding the Richmond Mine site impacted by surface water runoff and underground water flows.  Among those are:

• Rubicon Gulch flows into Bridal Falls and then into Spearfish Creek;

• Cleopatra Creek flows into Spearfish Creek;

• The north-northwest property drainage flows into Spring Creek;

• The south vertical shafts of the old Carbonate mining areas penetrate into the Paha Sapa limestone which recharges the Madison Water Formation; and

• The old Carbonate drainage tunnel area removes ground water and drains into Cold Springs Creek in the north-northwest drainage area.

---

[13]It is undisputed that Lawrence County requires a minimum buffer zone of 500 feet between lands disturbed by mining and adjoining landowners.  See Deposition of Michael Cepak (Docket 70-1, p. 40:9-11).

Sites within and outside the Richmond Mine site provide surface water and deep well water monitoring.  Depending upon the particular monitoring required at each site, LAC monitors these various sites every other week, monthly, quarterly, or semi-annually.  This monitoring is required by the South Dakota Department of Environment and Natural Resources ("SDDENR").  These monitoring sites cannot be moved to different locations.  Mr. Duex explained aquatic monitoring is more sensitive than just water quality.  Heavy rains may disturb protected sites, resulting in sedimentation runoff affecting fish and microscopic organisms living in the creeks.

Mr. Duex testified proper land management requires LAC to take an active role in maintaining its reclamation and closure activities.  Timber management is an important issue.  LAC was required to thin stands of timber to reduce the risk of forest fires and the destructive movement of pine beetles.  Fires not only could destroy structures on the site, but increase erosion and sedimentation into the water sheds.  Operational problems exist for LAC:  gates are left open; there are operational problems with the gates; and unknown people have been entering the mine site, bypassing internal gates to access clearly restricted and sensitive areas, such as the ARD areas and the reclaimed heap leach pads.  In addition, there are maintenance demands for the private roads on the mine site.  The SDDENR required a reduced-width road be left in place for use by the adjoining landowners, the Prentices, and LAC was required

in perpetuity to maintain the road and manage storm water runoff from the road.  Water quality data above acceptable limits will result in penalties being imposed by both the SDDENR and the Environmental Protection Agency under its National Pollution Discharge Emissions Standards.

Mr. Duex testified these reclamation and monitoring activities will continue for many years.  In his opinion, all ninety mining claims are still required for mining purposes.  In Mr. Duex's vision the "foreseeable future" is an indefinite time frame.  The closure period, which is defined as the reclamation and mitigation time period, could last up to thirty years.  There is presently a $10.7 million bond posted by LAC for the closure period.  Additionally, in 1987, South Dakota amended its mining laws to include "post closure obligations."  Once the closure bond is released a post-closure bond will be required by SDDENR.

Mr. Cepak, an engineer with the SDDENR, testified by deposition for trial.  (Docket 70-1).  He is the team leader of the group of engineers and hydrologists who regulate the Richmond Mine permits and conduct inspections of the site.  Id. at p. 4:10-20.  Under the SDDENR reclamation plan, the site must meet the criteria for wildlife habitat.  Id. at p. 7:1-5.  The SDDENR will be concerned about ongoing water treatment on the site for "many, many more years."  Id. at lines 8-10.

20

Mr. Cepak anticipates the start of the post-closure period in the next few years.  Id. at p.13:20-21.  But he testified the department still has concerns about the "long-term acid generation and ground water quality."  Id. at p. 14:23-24.  The main surface water drainage concerns of SDDENR focus on the Coal Creek drainage, Cleopatra Creek, and Rubicon Gulch into Spearfish Creek.  Id. at p. 19:16-25.

Mr. Cepak testified the post-closure status of various pieces of the property will be handled differently.

> Most reclaimed land would go into a post-closure care status and the period of that, how long that post-closure period would last would be based on the type of problem that that piece of land might have. Some areas that are reclaimed may have a very short or no post-closure period and other areas, especially the capped areas, would have a very long post-closure period.

Id. at p. 29:17-22.  Because of the long-term water treatment required at the Richmond Mine Site, Mr. Cepak estimates the post-closure period may require a 100-year bond.  Id. at p.44:1-25 & 45:1-3.  By comparison, the post-closure period for the Homestake Open Cut in Lead, South Dakota, is 100 years.  Id. at p. 20:12-15.

The court finds Mr. Duex's testimony credible.  This determination is based on his many years of mining experience at the Richmond Mine site, his communication with the SDDENR, the exhibits admitted at trial on these issues, and the testimony of Mr. Cepak.

"Every contract contains an implied covenant of good faith and fair dealing which prohibits either contracting party from preventing or injuring the other party's right to receive the agreed benefits of the contract." Garrett v. BankWest, Inc., 459 N.W.2d 833, 841 (S.D. 1990). "Good faith is derived from the transaction and conduct of the parties. Its meaning varies with the context and emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Id. (citing Restatement (Second) of Contracts § 205, cmt. a (1981)).

The term "sole discretion" in Section 4.3 of the 1988 RJVA allows LAC "to exercise [its] powers and discretion within the bounds of good faith and reasonable judgment." In re Schwan 1996 Great, Great Grandchildren's Trust, 2006 S.D. 9, ¶ 22, 709 N.W.2d 849, 856. All ninety mining claims are presently needed to support LAC's reclamation activities. While Mr. Fowler and LAC have had their differences of opinions over the past several years about the release of some portion of the mining claims, the court concludes there is no evidence of bad faith on LAC's part. LAC, in the exercise of its sole discretion, used reasonable judgment to conclude the ninety mining claims should not be released under Section 4.3 of the 1988 RJVA.

**ISSUE #8:**   Is LAC obligated at this time under the 1988 RJVA to release property to Fowler?

For the reasons stated above, the court finds all ninety mining claims are currently necessary for post-mining and reclamation purposes as contemplated

by the 1988 RJVA.  LAC has no obligation to Mr. Fowler to release any portion of the ninety mining claims at this time.

**ORDER**

Based upon this analysis and the order on cross motions for summary judgment (Docket 46), it is hereby

ORDERED that plaintiff's amended complaint (Docket 16) seeking a declaratory judgment, specific performance and quiet title in the ninety mining claims is granted in part and denied in part.

IT IS FURTHER ORDERED that defendant's counterclaim (Docket 17) seeking a declaratory judgment and quiet title in the ninety mining claims is granted in part and denied in part.

IT IS FURTHER ORDERED that defendant's motion to dismiss (Docket 53) is denied.

IT IS FURTHER ORDERED that defendant's oral motions at trial for a directed verdict as a matter of law are denied.

IT IS FURTHER ORDERED that plaintiff's motion for temporary restraining order, preliminary injunction and permanent injunction (Docket 40) is denied.

IT IS FURTHER ORDERED that, as addressed in Issue #1 of the order on cross motions for summary judgment (Docket 46), the 1988 Restated Joint Venture Agreement superseded the 1984 Joint Venture Agreement.  Any

changes from the earlier documents, when compared with the language of the 1988 Restated Joint Venture Agreement, are no longer effective.

IT IS FURTHER ORDERED that, as addressed in Issue #2 of the order on cross motions for summary judgment (Docket 46), under the 1988 Restated Joint Venture Agreement, Viable is to receive a 7.5 percent participation payment interest in the Richmond Hill Prospect.

IT IS FURTHER ORDERED that, as addressed in Issue #2 of the order on cross motions for summary judgment (Docket 46), under the 1988 Restated Joint Venture Agreement, Bond Gold, and its successors-in-interest, including defendant LAC Minerals (USA), LLC, as manager retains all rights in the Richmond Hill Prospect including, but not limited to, retention of any funds remaining after liquidation of assets and payment of all creditors.

IT IS FURTHER ORDERED that, as addressed in Issue #3 of the order on cross motions for summary judgment (Docket 46), Viable retains the reversionary interest in the ninety mining claims.

IT IS FURTHER ORDERED that, as addressed in Issue #4 of the order on cross motions for summary judgment (Docket 46), the ninety mining claims are subject to a condition subsequent requiring the manager to reassign the property back to Viable, and its successors-in-interest, when the mining deeds' purposes are exhausted.

24

IT IS FURTHER ORDERED that, as addressed in Issue #5 hereinabove, reversionary rights associated with the ninety mining claims were validly transferred by Viable to Mr. Douglass and then to Mr. Fowler, and Mr. Fowler is the owner of the reversionary rights to the ninety mining claims under Section 4.3 of the 1988 Restated Joint Venture Agreement.

IT IS FURTHER ORDERED that, as addressed in Issue #6 of the order on cross motions for summary judgment (Docket 46), plaintiff's claims are not time barred.

IT IS FURTHER ORDERED that, as addressed in Issue #7 hereinabove, LAC Minerals (USA), LLC, has acted in good faith in its decision to not release any of the ninety mining claims for reversion under Section 4.3 of the 1988 Restated Joint Venture Agreement at this time.

IT IS FURTHER ORDERED that, as addressed in Issue #8 hereinabove, LAC Minerals (USA) is not required to release any of the ninety mining claims for reversion to Mr. Fowler under Section 4.3 of the 1988 Revised Joint Venture Agreement at this time.

IT IS FURTHER ORDERED that pursuant to Fed. R. Civ. P. 54(d)(1) that neither party is the prevailing party for assessment of costs, as both parties were successful on the merits on a number of significant issues.

IT IS FURTHER ORDERED that each party shall bear their own costs and attorney's fees.

25

The court will enter a separate judgment consistent with this order.

Dated August 10, 2011.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE

26